**WASHINGTON MUTUAL SAVINGS BANK**
and
**Grays Harbor Savings & Loan Association, Plaintiffs,**
v.
**FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant.**

**No. 45–71C3.**

United States District Court,
W. D. Washington.
July 21, 1972.

Ashley, Foster, Pepper & Riviera, Louis H. Pepper and Richard E. Keefe, Seattle, Wash., Arnold & Porter, John D. Hawke, Jr., Washington, D. C., for plaintiffs.

Karr, Tuttle, Koch, Campbell, Mawer & Morrow, Payne Karr, Seattle, Wash., William E. Murane, Gen. Counsel, J. William Via, Jr., Counsel, F. D. I. C., Washington, D. C., Ford R. Paulson, Regional Counsel, F. D. I. C., San Francisco, Cal., for defendant.

## MEMORANDUM OPINION AND ORDER

SHARP, District Judge.

This is a suit for declaratory judgment filed by the plaintiffs, seeking review of a Federal Deposit Insurance Corporation decision denying approval of a proposed consolidation between the two named plaintiffs. The matter is submitted to this court on motions for summary judgment by both plaintiffs and defendant.

■ The case is one of first impression under the Bank Merger Act of 1966 [12 U.S.C. § 1828(c)], as it deals with *disapproval* rather than approval of a requested consolidation.[1] In the case of an *approved* merger, the reviewing court is specifically required under the Act to

review de novo the determination of the responsible agency [12 U.S.C. § 1828(c) (7) (A)]. However, the Act is silent on the method, standards and scope of review where the agency denies a merger. In this court's opinion, the review is substantially more limited and the court should apply the guidelines provided for review under the administrative Procedures Act (5 U.S.C. § 701 et seq.). As stated by this court in its oral opinion of March 3, 1972, the scope of review is limited to the standards set forth in 5 U.S.C. § 706(2) (A–D), which provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

. . . . . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

. . . . . .

These standards were discussed recently by the United States Supreme Court in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 413–415, 91 S.Ct. 814, 822–823, 28 L.Ed.2d 136, 151–152 (1971). There, the court directed the reviewing court to engage in "substantial review," a "thorough, probing, in-

---

1. The court notes that according to Chairman Sprague of the FDIC, this litigation is welcomed by the FDIC in order to decide certain issues deemed important to future considerations of bank mergers and consolidations, including the question "whether the regulatory agencies may deny merger applications even though violations of Section 7 of the Clayton Act are not found." FDIC News Release, November 6, 1971.

depth review." The reviewing court should first determine whether the responsible agency acted within the scope of its authority, which determination requires a delineation of the scope of that authority and discretion. If the agency acted within the scope of its authority, then the reviewing court must determine whether the choice made was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In making this latter determination,

. . . the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Overton Park, supra*, 401 U.S. at 416, 91 S.Ct. at 823–824.

█ The review must be based upon the entire administrative record that was before the responsible agency. *Id.* at 420, 91 S.Ct. at 825.[2] From this record, the court must make its determination of the propriety of the FDIC's decision to disapprove the proposed consolidation.

Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. *Overton Park, supra*, 401 U.S. at 416, 91 S.Ct. at 824.

With the above standards for review in mind, the court now turns to the application of these standards in the present case.

Washington Mutual Savings Bank is the largest thrift institution[3] in the State of Washington, holding some $744 million in deposits comprising 22.9 percent of the deposits in such institutions. It has its main office in Seattle and operates some 12 branch offices in the Seattle area, and 9 more in various locations throughout the state. Its nearest branch to Grays Harbor Savings & Loan is in Olympia, 50 miles to the east of Grays Harbor Savings & Loan's offices.

. Grays Harbor Savings & Loan (S&L) is a small savings and loan institution located in Aberdeen, Washington. It is one of the smallest thrift institutions in the state, having only some $4.7 million in withdrawable balances, or about 0.15 percent of the statewide deposits in thrift institutions. It has no branch offices and is fourth in size out of five thrift institutions, all savings and loans, serving the Aberdeen-Hoquiam area.[4]

On June 10, 1970, Washington Mutual filed with the FDIC an application for approval of its proposed consolidation with Grays Harbor Savings & Loan. Shortly thereafter, as required except in exceptional circumstances by 12 U.S.C. § 1828(c) (4), the FDIC requested reports on the competitive factors involved in

2. In response to a prior discovery motion of plaintiffs, this court, over the objection of the FDIC, required disclosure of nearly all of the record which was before the FDIC at the time of its consideration of this application. The court reasoned that it would be impossible to determine whether the Board considered all of the relevant factors without examining the material the Board considered.

This record, consisting of a so-called "public file" and an "internal file," will be referred to herein by the initials "PF" and "IF" respectively.

3. Thrift institutions, as used in the context of this opinion, refers to mutual savings banks and savings and loans, as opposed to commercial banks.

4. Comparative market shares of thrift institutions serving the Aberdeen-Hoquiam market area:

| | | Deposits | Market Percent |
|---|---|---|---|
| 1. | Aberdeen Fed. S & L | $30 million | 47.1% |
| 2. | 1st Fed. S & L of Aberdeen | 17 million | 26.7 |
| 3. | 1st Fed. S & L of Hoquiam | 9 million | 14.1 |
| 4. | Grays Harbor S & L | 4.7 million | 7.4 |
| 5. | Capitol S & L | 3 million | 4.7 |

the proposed consolidation from the Attorney General, the Federal Reserve Board, and the Comptroller of the Currency. Each of these agencies submitted its report as requested, none finding any significant anticompetitive factors, either present or potential.[5] For example, the Comptroller of the Currency stated in his report:

The size of the Grays Harbor Savings and Loan Association is its basic limiting factor as a competitive force. The addition of $4.6 million in assets to the charter bank will have no significant effect on concentration of banking resources in the state. The effect of the consummation of the proposed transaction will be in the Aberdeen-Hoquiam area where it will introduce a bank more able to compete with the other institutions in the area and better able to meet the needs of the community. ·PF at 60.

The State Supervisor of Banking for the State of Washington submitted his approval of the proposed consolidation agreement on August 14, 1970. PF at 92. Competing institutions were contacted by the FDIC Examiner in Charge, and no adverse comment received.

As the FDIC (unlike the Comptroller of Currency) provides no hearing procedure, the processing of proposed consolidations or mergers consists of staff investigations, with recommendations to the Board of Directors of the corporation. These findings and recommendations seem particularly important when there is no opportunity for interested parties to be heard. In his investigation report, the Examiner in Charge for the FDIC stated:

. . . Its already significant share of the state mutual savings bank business would not be materially affected by this proposal. The resulting bank would be the smallest unit of the thrift

institutions in the Aberdeen-Hoquiam service area. The proposed consolidation would have no adverse effect on competition. IF at 19.

Further, he states:

The resulting bank would make available to the residents of the Grays Harbor area certain types of time deposits not presently offered by S&L. Also, other loans and services not being provided by S&L, either by design or statutory limitations, would be available at the resulting bank. The residents of the Grays Harbor area should benefit from more aggressive management responsive to the needs of the community. IF at 16.

In conclusion, the Examiner recommended the application be approved, and the regional director for the FDIC concurred in his recommendation.

The FDIC Division of Research, in recommending approval and finding that positive benefits as to the convenience and needs of the community to be served would result from the merger, stated:

Merger of the applicants would have a positive effect in terms of convenience and needs and other banking considerations. Most importantly, a savings bank with its full line of services and higher limits on time deposit interest rates would operate in the Grays Harbor market for the first time. In addition, the management succession problem which presently exists for Grays Harbor Savings and Loan would be eliminated. IF at 29.

On November 9, 1970, the FDIC Board of Review voted in favor of approval of the proposed consolidation, submitting a proposed order to the Board for its approval.

The Board of Directors for the FDIC issued its order December 18, 1970, denying approval of the proposed merger.[6]

---

5. References to reports from other agencies as contained in FDIC General File:

| | |
|---|---|
| Attorney General | Page 59 |
| Comptroller of Currency | Page 61 |
| Federal Reserve Board | Page 54 |

6. Two of the three members of the Board voted on the application. The third member (The Comptroller of Currency) abstained inasmuch as his approval, as quoted above, had already been registered.

In its opinion, after finding that the proposed consolidation would not eliminate any meaningful competition but could eliminate some potential competition by de novo branching of Washington Mutual into the Grays Harbor service area, the FDIC states:

> More importantly, the proposed merger would establish a significant precedent for the approval of additional mergers in highly concentrated markets in the State of Washington and elsewhere, among commercial banks as well as mutual thrift institutions, with the cumulative effect of further concentrating the banking resources of a given market in the largest institutions which operate there. As such concentration continues, the public's choice of alternate sources of banking services is likely to diminish. Given the fact that Washington Mutual is more than three times the size of the next largest thrift institution in the State and that it already controls 22.9 percent of total thrift institution deposits on a Statewide basis, approval of the proposed merger could easily lead to other merger proposals on the part of Washington Mutual to extend its branch system into new areas by the merger route rather than by the establishment of de novo branches, thus losing successive opportunities for increasing the public's choice of banking alternatives in each area. A denial of the proposed merger, on the other hand, would encourage S&L to seek out a different merger partner from among the State's 73 other mutual thrift institutions, thereby also preserving the possibility of more effective competition against Washington Mutual in the future from among the State's other thrift institutions. PF at 104.

Thereafter, on December 29, 1970, Washington Mutual sent a letter request to the FDIC for reconsideration. On January 6, 1971, a similar request was made by Grays Harbor Savings & Loan. Subsequently, the FDIC granted Washington Mutual the opportunity for an oral presentation of its application for reconsideration. An informal hearing was held, during which presentations were made by certain officers of the two banking institutions, and written memorandums were submitted by the Washington State Supervisor of Banking.

On July 30, 1971, the FDIC issued its opinion again denying approval of the proposed consolidation. In this second opinion, the FDIC discussed the "line of commerce" question distinguishing between "thrift institutions" and "commercial banks." It also withdrew part of its prior decision, acknowledging there was little likelihood of Washington Mutual's branching de novo into the Grays Harbor service area due to the area's slow growth and present population per banking institution. The opinion then acknowledges that this fact was not the reason for the denial of approval, but, in fact, the main reason was that the merger would be a significant precedent for the approval of other mergers in highly concentrated markets, as quoted above from the first opinion.

August 27, 1971, the complaint in the present action was filed seeking judicial review by declaratory judgment of the actions of the FDIC.

The authority of the FDIC to approve or disapprove consolidations or mergers between certain insured banking institutions is provided by the Bank Merger Act of 1966, 12 U.S.C. § 1828(c) (2), which provides:

> No insured bank shall merge or consolidate with any other insured bank or, either directly or indirectly, acquire the assets of, or assume liability to pay any deposits made in, any other insured bank except with the prior written approval of the responsible agency, which shall be—
>
> .    .    .    .    .    .
>
> (C) the Corporation if the acquiring, assuming, or resulting bank is to be a nonmember insured bank (except a District bank).

Washington Mutual Savings Bank is a nonmember insured bank.

Section (c) (5) of the Act provides:

The responsible agency shall not approve—

(A) any proposed merger transaction which would result in a monopoly, or which would be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the business of banking in any part of the United States, or

(B) any other proposed merger transaction whose effect in any section of the country may be substantially to lessen competition, or to tend to create a monopoly, or which in any other manner would be in restraint of trade, unless it finds that the anticompetitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served.

In every case, the responsible agency shall take into consideration the financial and managerial resources and future prospects of the existing and proposed institutions, and the convenience and needs of the community to be served. 12 U.S.C. § 1828(c)(5).

This Act was passed in 1966, and amended, in fact replaced, the Bank Merger Act of 1960. The purpose of the 1966 Act, as stated in the House Committee Report #1221, 1966 USCAAN 1860:

Your committee has attempted to furnish both the agencies and the courts with more definite guidelines for dealing with the foregoing problems. Existing law (the sixth sentence of sec. 18(c) of the Federal Deposit Insurance Act) provides that in the case of a merger transaction the "agency shall also take into consideration (in addition to the so-called banking factors) the effect of the transaction on competition (including any tendency toward monopoly) and shall not approve the transaction unless, after considering all such factors, it finds the transaction to be in the public interest."

The intended legal effect of the bill is to modify the foregoing provision in three respects:

First, it is intended to make clear that no merger which would violate the antimonopoly section (sec. 2) of the Sherman Antitrust Act may be approved under any circumstances.

Second, the bill acknowledges that the general principle of the antitrust laws —that substantially anticompetitive mergers are prohibited—applies to banks, but permits an exception in cases where it is clearly shown that a given merger is so beneficial to the convenience and needs of the community to be served—recognizing that effects outside the section of the country involved may be relevant to the capacity of the institution to meet the convenience and needs of the community to be served—that it may be in the public interest to permit it.

Third, the bill provides that this rule of law is to be applied uniformly, in judicial proceedings as well as by the administrative agencies. 1966 USCAAN at page 1862.

Congress, in enacting the bill, was concerned with the applicability of antitrust law to bank mergers, and the Act was aimed at delineating the scope of their application, with emphasis on consistency between the various arms of government dealing with such mergers. Congressman Reuss of the Committee on Banking and Currency, in explaining the purpose and intent behind the 1966 Act, stated:

The inclusion of the very language used in the Clayton Act section 7, and the Sherman Act section 1, in H.R. 12173 was not merely a coincidence. This language was intentionally used so as clearly to indicate to the bank supervisory agencies and to the courts that the antitrust standards which have been developed over the last 75 years on the basis of case law definition of these statutory provisions are

intended to be incorporated in the application of the proposed act. We are not establishing new standards which depart from well developed antitrust standards. We are, on the contrary, stating that these antitrust standards should continue to apply to bank mergers . . .

. . . this bill would make the competitive factor as defined by the antitrust laws, the primary factor to be used both by the bank supervisory agencies and the courts in determining whether to approve a merger. 112 Cong.Rec. at page 2444.

It is apparent from the opinions of the FDIC that it has determined it has the authority to devise tests of the anticompetitive effects or "implications" of a merger never contemplated by the Congress in enacting this legislation, nor by the courts in their 75 years of devising standards applicable to antitrust. As the Supreme Court stated two years after the 1966 Amendments:

Only one conclusion can be drawn from the exhaustive legislative deliberations that preceded passage of the Act: Congress intended bank mergers first to be subject to the usual antitrust analysis . . . . United States v. Third National Bank in Nashville, 390 U.S. 171, 182, 88 S.Ct. 882, 889, 19 L.Ed.2d 1015, 1024 (1968).

The FDIC's determination was ostensibly aimed at what it considered a necessary basis for curtailing possible anticompetitive tendencies in their incipiency, which is precisely the direction in which antitrust principles under the Clayton Act, § 7, are aimed:

Having determined the relevant market, we come to the ultimate question under § 7: whether the effect of the merger "may be substantially to lessen competition" in the relevant market. Clearly, this is not the kind of question which is susceptible of a ready and precise answer in most cases. It requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future; this is what is meant when it is said that the amended § 7 was intended to arrest anticompetitive tendencies in their "incipiency." United States v. Philadelphia National Bank, 374 U.S. 321, 362, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915, 944 (1963).

These standards were placed in the act to insure compliance by the banking industry with the policies embodied in the antitrust laws, with an exception allowed due to recognition of the type of industry which banking is and the effect of bank failures on the communities served. The banking agencies have no peculiar expertise in the area of competition and antitrust. Their area of expertise is in what is termed the "banking factors," i. e., convenience and needs of the community to be served and the strength and ability of the banks in that community to serve those needs. In this regard, while the Board found the financial and managerial resources and future prospects of both institutions consistent with approval, the Board opined that these factors are outweighed by its determination as to anticompetitive effects of the merger.

The Corporation has reviewed again and reaffirms its earlier findings on the benefits to the public which may be expected to occur if this application is approved and also its findings with respect to S & L's management succession problem. It continues to differ with the applicants as to the weight which should be assigned these findings in reaching an overall conclusion on the application. PF at 243.

The Bank Merger Act of 1966, as did the Act of 1960, provides that "[in] the interests of uniform standards" the responsible agency will request reports on the competitive factors involved in the proposed merger from the other two banking agencies and the Attorney General. In the legislative history

behind this provision in the 1960 Act, it was stated:

> Your committee agrees that every effort must be made to avoid a situation where one Federal agency is "tough", about mergers and another one is "easy", where there might be an inducement to arrange mergers so as to result in the kind of bank where approval could be easily obtained. To help guard against this kind of development, the bill provides that the agency having jurisdiction over a proposed merger shall request a report from the other two banking agencies on the competitive factors involved, unless it must act immediately to prevent a bank failure . . . 1960 USCAAN 1995, 2005.

Common sense dictates that the only way to have uniform application of the Act to the mergers sought is to apply uniform standards, which standards were set forth by Congress in this instance as the standards embodied in the antitrust laws. When an agency applies entirely unprecedented standards, having no basis in logic or reason, as in this case, uniformity of standards, and their application, is impossible.

■ In its statement on reconsideration, the FDIC dwells initially with the "relevant line of commerce," distinguishing between "thrift institutions" and "commercial banks" as separate lines of commerce. In this determination it relies upon the decisions of the Supreme Court closest to the subject. These cases have held that commercial banks are a distinct line of commerce from thrift institutions in assessing the competitive effects of bank mergers. Such delineation is generally accepted due to the differences in services offered by the two types of institutions and different regulations controlling their activities and lending limits. United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 83 S.Ct. 1715, 1737, 10 L.Ed.2d 915

(1963); United States v. Phillipsburg Nat'l Bank, 399 U.S. 350, 90 S.Ct. 2035, 2041–2042, 26 L.Ed.2d 658 (1970). These determinations by the agency were based on accepted antitrust principles and will not be disturbed by this court.

■ However, without apparent reason, the FDIC proceeded to apply its competitive test utilizing the entire State of Washington as the relevant geographic market affected by the proposed consolidation. There may well be situations in the antitrust context in which an entire state is the relevant market area affected. However, where banking activities are involved the relevant market has generally been defined as the area served by the acquired bank due to the localized nature of banking activities. U. S. v. Phillipsburg Nat'l Bank, *supra*, 399 U.S. at 359–362, 90 S.Ct. at 2041–2042; U. S. v. Philadelphia Nat'l Bank, *supra*, 374 U.S. at 357–358, 83 S.Ct. at 1738. The mere fact that Washington State banking law would allow Washington Mutual to branch statewide does not make the entire state the relevant market.

> Permissive statewide branching merely extends the political boundaries in which a bank may open branches, local units, to operate in local markets. It does not bring to any particular bank or banking unit depositors or borrowers from all over the state. "Individuals and corporations typically confer the bulk of their patronage on banks in their local community; they find it impractical to conduct their business at a distance." [citing Philadelphia, *supra*]. United States v. Crocker-Anglo National Bank, 277 F.Supp. 133, 173 (N.D.Cal.1967).

The effect of the FDIC opinion in this case is that Washington Mutual may not, by "foothold" acquisition, offer its services to customers in the Grays Harbor Savings & Loan service area because it might be a precedent encourag-

ing statewide concentration [7] of thrift institution resources.[8]

The record before the Board contains data for a further breakdown of the relevant market concentration. 1970 figures show that of Washington Mutual's $740.1 million market share, it derived $643.1 million from the Seattle-Everett service area, or approximately 87 percent of its statewide deposits.[9] Statewide, exclusive of the Seattle-Everett area, Washington Mutual holds only 6.5 percent of deposits in such institutions, and Grays Harbor Savings & Loan, which has no market area outside the Aberdeen-Hoquiam area, has 0.3 percent. The merger of the two would then raise Washington Mutual's share of this market to 6.8 percent. These figures show the inaccuracy and unreasonableness of applying simple gross percentages to determine market concentration and competitive effect. While it is true that Washington Mutual is the largest thrift institution in the state with 22.9 percent of the deposits, this figure by itself does not truly indicate the competitive impact of Washington Mutual on the thrift institution markets in the State of Washington.

. . . We pointed out in *Philadelphia Bank, supra,* at 362, that a prediction of anticompetitive effects "is sound only if it is based upon a firm understanding of the structure of the relevant market; . . . ." U. S. v. Phillipsburg Nat'l Bank, *supra,* 399 U.S. at 365–366, 90 S.Ct. at 2044.

It is therefore the opinion of this court that the FDIC failed to take into account truly relevant factors upon which a rational opinion as to competition could be based in line with the established principles of antitrust law as written by Congress into the Bank Merger Act. Such compliance with established principles is necessary, first and fundamentally, in order for there to be uniformity between the agencies charged with the responsibility of applying the provisions of the Act, and, secondarily, in order for businesses to make enlightened decisions in the area of such merger transactions.

In addition, even were this court to accept the relevance of the statewide percentages used by the FDIC, the

7. One of the bases for the FDIC opinion is that there exists a highly concentrated market in the State of Washington. Market concentration is relative to establishment of the relevant market affected by such merger. The merger in this instance would be what is termed a conglomerate merger, since the two institutions are not actual competitors and are in different geographic markets. (Neither has any real services extending into the product area of the other.) The concern becomes one then of "potential competition" under Department of Justice merger guidelines, and this one is far below any set up by that agency. Note: Dept. of Justice Merger Guidelines, set forth in part 9, pages 20–23, of Plaintiffs' Exhibits to Memorandum.

8. Counsel for the FDIC stated to this court on oral argument that the net effect of this decision is that Washington Mutual is precluded from any further mergers, except in dire circumstances of imminent collapse, because it is the largest thrift institution in the state. The only conclusion to be drawn from this statement is that in the eyes of the FDIC, "bigness" is per se "bad," and this, in itself, is *the* relevant factor in determining merger applications.

9. As shown on the map included as a part of the required information on the application for the merger to the FDIC, Washington Mutual's branches are located in certain defined areas:

| | | |
|---|---|---|
| 1. | Seattle proper | Eight (8) offices |
| 2. | Bellevue | One (1) office |
| 3. | Renton | One (1) office |
| 4. | Auburn | One (1) office |
| 5. | Federal Way | One (1) office |
| 6. | Everett | One (1) office |
| 7. | Spokane | Three (3) offices |
| 8. | Pullman | One (1) office |
| 9. | Yakima | One (1) office |
| 10. | Grandview | One (1) office |
| 11. | Kennewick | One (1) office |
| 12. | Vancouver | One (1) office |
| 13. | Olympia | One (1) office |

Of the above set-out locations the first six would comprise the Seattle-Everett area, making thirteen offices in the one area. The Spokane area has three offices, and the remaining six offices are spread throughout the state.

rationale of its opinion escapes this court. The opinion states that:

> . . . approval of the proposed merger could easily lead to other merger proposals on the part of Washington Mutual to extend its branch system into new areas by the merger route rather than by the establishment of de novo branches, thus losing successive opportunities for increasing the public's choice of banking alternatives in each area. . . . PF at 104.

This statement, incorporated in both the original and final opinions of the FDIC, not only disregards its own continuing control over future merger proposals, but overlooks the facts in this case. The Board, as well as everyone else concerned, recognizes that Grays Harbor Savings & Loan has a serious management succession problem and will undoubtedly have to merge with another institution to relieve the difficulty. Therefore, whether this application is granted or denied, there is going to be one less thrift institution in the State of Washington and the same number in the Aberdeen-Hoquiam area. The Board, in its second opinion, recognizes that the possibility of Washington Mutual branching de novo into the Grays Harbor service area is quite remote due to the economic condition of the area and its present population per institution. To claim, then, that the approval of this merger would be a significant precedent for future mergers is not logical, since this is not a case of de novo branching versus merger, but a case where the only potential realistic possibility is the entry of some outside firm by merger with S & L. In future situations which may arise, de novo branching may be an actual viable possibility, which raises the question of potential competition and may be dealt with under established antitrust principles. A determination such

as the Board's in this case must be set aside as arbitrary where there is no logical connection between the facts and the conclusions reached and where the reasoning behind the decision is without a truly rational basis.

The only question remaining at this point is the proper remedy. Plaintiffs assert that this court should issue its order compelling the FDIC to approve the merger, pointing out that the record is thorough and complete, and the Board has already found, from its review of the banking factors, that the area concerned would benefit from a merger. The FDIC contends the proper remedy is to remand to the agency for consideration of the proposed consolidation in conformity with the opinion of this court.

The guiding principle, as stated by the Supreme Court, is

> that the function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the [agency] for reconsideration. FPC v. Idaho Power Co., 344 U.S. 17, 20, 73 S.Ct. 85, 87, 97 L.Ed. 15, 20 (1952).

The court's decision in this case is based primarily upon the failure of the FDIC to apply relevant factors based on established principles under the antitrust laws, as intended to be applied by the Congress in enacting the Bank Merger Act.

■ While this Court may be of the opinion that only one decision is proper on the basis of the files and records relevant to a determination in this case, it is not the province of a reviewing court to make the final judgment once the law is determined. Instead, the remedy is to remand the matter to the responsible agency for determination in light of the court's construction of the governing legal principles.