SOUTHWEST MISSISSIPPI BANK and
Bank of McComb, Plaintiffs,

v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, Defendant.

Civ. A. No. J78–0384(N).

United States District Court,
S. D. Mississippi,
Jackson Division.

Aug. 29, 1979.

Gene A. Wilkinson, Stennett, Wilkinson & Ward, Jackson, Miss., for plaintiffs.

Robert E. Hauberg, U. S. Atty., Jackson, Miss., Rebecca L. Ross, Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

WALTER L. NIXON, Jr., District Judge.

This is a suit filed by the plaintiff banks, Southwest Mississippi Bank (SMB) and Bank of McComb (BM) against the defendant, Federal Deposit Insurance Corporation (FDIC), for a declaratory judgment and injunctive relief, seeking review of the FDIC's decision denying approval of the proposed consolidation or merger of the two named plaintiffs pursuant to the Bank Merger Act of 1966, 12 U.S.C. § 1828(c).

The basis for the disapproval by the FDIC is that the proposed consolidation

would substantially lessen competition in violation of the antitrust provisions of the Clayton Act, 15 U.S.C. § 18, and the Bank Merger Act of 1966, as amended, 12 U.S.C. § 1828(c)(5)(B). This case is submitted to this Court on Motions for Summary Judgment by the plaintiffs and the defendant. This Court has jurisdiction of the parties and of the subject matter.

### *History and Background*

The two plaintiff banks are non–member insured banks organized and chartered under the laws of the State of Mississippi. On October 27, 1977, plaintiff SMB, whose main office is in Magnolia, Pike County, Mississippi, submitted an application for merger to the defendant, FDIC, pursuant to Section 1828(c) of the Federal Deposit Insurance Act, 12 U.S.C. § 1828(c), seeking the written approval of the defendant to consolidate with the plaintiff, BM, whose principal office is in McComb, Pike County, Mississippi, under the charter of SMB, with the resulting bank to be known as First Bank of Southwest Mississippi.

As stated, both plaintiff banks are domiciled in Pike County, Mississippi, which is located in the southwestern part of the State and borders the State of Louisiana. Pike County, a rural type county, has two major centers of population, McComb, the most populous city or town in the county and which is located in the northern half of Pike County, and Magnolia, the county seat, which lies in the southern half of the county.

SMB, which had deposits of 29.6 million dollars on June 30, 1978, has in addition to its main office in Magnolia, branches in Fernwood, which is located between Magnolia and McComb, and Osyka, which lies south of McComb near the Louisiana line. Fernwood is four miles from McComb and Magnolia and McComb are eight miles apart.

Plaintiff BM, which had deposits of 37.2 million dollars on June 30, 1978, has three offices, including its main office, located in the city of McComb, and a fourth office located in the town of Summit, north of McComb.

BM competes in the northern half of Pike County with Deposit Guaranty National Bank of Jackson, Mississippi (DGNB), and First National Bank of Jackson, Mississippi (FNB), the two largest banks in the State. As of June 30, 1978, DGNB and FNB had deposits of 993 million dollars and 902 million dollars, respectively. FNB maintains three branches in McComb, and DGNB maintains five branches in the northern half of Pike County, four of which are located in McComb and one just south of Summit.

No other banks compete with SMB in the southern half of Pike County inasmuch as Magnolia and Osyka, the two incorporated municipalities therein, are, because of their small populations, closed to branch entries by other banks under the provisions of Mississippi law. Miss.Code Ann. §§ 81–7–5 and 81–7–7 (1972).

The State Comptroller, Mississippi Department of Bank Supervision, approved the proposed consolidation agreement on April 14, 1978, pursuant to the governing State statute, Miss.Code Ann. § 81–5–85. The Comptroller's Certificate of Approval was forwarded to Mr. Roy E. Jackson, Regional Director of FDIC on April 18, 1978.

Prior to receiving the State Comptroller's Certificate of Approval, FDIC has assigned a field examiner, Mr. James M. Martin, Jr., to investigate the proposed consolidation. Mr. Martin made an investigation during the period of February 22–24, 1978, and in his analysis of the effect of the proposed merger on competition pointed out that the market area of SMB "is limited primarily to the lower part of Pike County . . . ," and that the relevant trade area of the Bank of McComb "includes northern Pike County . . .". His investigation convinced him that plaintiff banks had two separate market areas with "some overlapping," and concluded his report on competitive factors as follows: "It is therefore the conclusion of the undersigned that the proposal would have a positive rather than harmful effect on the competitive climate in the service or

market area of the Resulting Bank." Stating that the existing competition between SMB and BM was "minimal", Mr. Martin concluded "that all factors are favorable; that the effect on competition would not be adverse and there would not be a tendency toward a monopolistic situation if the consolidation is consummated. It is therefore recommended that the application be approved."

In the interim, November, 1977, in compliance with the provisions of 12 U.S.C. § 1828(c)(4), the FDIC sent copies of the merger application to the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, and the Attorney General of the United States, requesting reports on the competitive factors involved in the merger proposal. While the application was being processed in the Memphis Regional Office of the FDIC, the requested advisory opinion of the Federal Reserve Board, received by the FDIC and made available to the plaintiff banks, concluded that the proposed merger would have an adverse effect on competition, considering the relevant geographic market in question was "all of Pike County", that is, that the subject banks were competitors in the "Pike County banking market". This conclusion was premised upon a finding that the relevant geographic market was all of Pike County, and that the merger application submitted by SMB to the FDIC at no time alluded to a division of Pike County into its southern and northern parts, but instead stated that the plaintiff banks were competitors in Pike County. Inasmuch as plaintiffs contended that they at no time represented or conceded that they were in actual, direct substantial competition in the entire county, they commissioned Dr. Charles N. Dennis of the University of Southern Mississippi, an economist experienced in banking matters, to find the actual configuration of each of the bank's geographic markets and evaluate the proposed merger.

Dr. Dennis completed his study and evaluation and submitted his written report thereof to plaintiffs' attorneys who in turn on March 10, 1978 forwarded it to the Re-

gional Director of the FDIC for the purpose of supplementing the original application on file. After receiving Dr. Dennis' evaluation report, Mr. Roy E. Jackson, the FDIC Regional Director, concurred in the recommendation of the Field Examiner, Mr. Martin, that the merger be approved.

On March 22, 1978, the Dennis evaluation report was transmitted by the FDIC to the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, and the Attorney General for their further consideration in reporting on the competitive factors involved in the merger proposal.

The Board of Governors, which had already submitted its report, did not qualify its "substantially adverse" finding and did not submit an amended report. On May 9 and May 18, 1978, respectively, the Comptroller of the Currency and the Attorney General submitted their reports to the FDIC, each finding that the relevant geographic banking market was the entire county of Pike and concluding that the proposed merger would have a substantially adverse effect upon competition in commercial banking in Pike County despite the fact that Dr. Dennis' report reflected that "only three per cent of the Bank of McComb's demand deposits are in an area clearly defined as the Southwest Mississippi Bank's market area" and that "approximately six per cent of the Southwest Mississippi Bank's demand deposits are in the area clearly defined as the Bank of McComb's market area," that the two banks are not competitors and the proposed merger would not result in a monopoly or be in furtherance of a combination of conspiracy to monopolize or attempt to monopolize the business of banking in Pike County.

Subsequently, after considering the merits of the case, the FDIC Board of Directors issued an order dated May 19, 1978, denying the application to consolidate, together with a brief statement of its bases for denial. In its order, the FDIC found that the proposed consolidation would "eliminate substantially existing competition" between the plaintiff

banks after finding that they were in direct competition in Pike County, pointing out that McComb and Magnolia were approximately eight miles apart and connected by Interstate Highway 55. The defendant's board of directors stated in its order:

"Due to the ease of access and the proximity of five of the proponents' seven offices, the two banks are in direct, significant competition throughout Pike County and approval of the proposed consolidation would eliminate this competition."

The Board of Directors made no effort to refute those findings, which were a part of the record before it.

On May 25, 1978, the plaintiff banks transmitted a Petition for Reconsideration to the FDIC and requested an opportunity to make an oral presentation in rebuttal of the denial, pursuant to FDIC's regulation (12 C.F.R. § 303.10(e)). The oral presentation was made on June 23, 1978 at the FDIC's offices in Washington, D. C., at which the banks, represented by counsel, submitted three pages of materials, together with a map of Pike County and a map of Mississippi.

Subsequently, on August 2, 1978, the FDIC's Board of Directors issued an Order affirming its original denial of the application, together with a brief statement of reasons therefor.

Following this action, the two banks filed this action in this Court on August 28, 1978, premising jurisdiction upon Section 9 of the Federal Deposit Insurance Act (12 U.S.C. § 1819); Sections 1331, 1337 and 1349 of the Judicial Code (28 U.S.C. §§ 1331, 1337 and 1349); the Administrative Procedure Act (5 U.S.C. §§ 701–706); and the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201–2202).

*Standard on Appeal–Scope of Review*

■ The plaintiffs and defendant vigorously disagree concerning the scope of review by this Court of the FDIC's disapproval of their proposed consolidation which was based solely on its conclusion that the merger would eliminate substantial existing competition between the plaintiff banks in Pike County, Mississippi. The sole issue before this Court is that the defendant's action was predicated upon its allegedly erroneous conclusion that the relevant geographic market utilized to arrive at the anticompetitive finding was the whole of Pike County, rather that the northern half of the county in which the proposed acquired bank, BM, was actually competing as reflected in Dr. Dennis' report.

The defendant concedes that if this case involved an appeal by the United States from an *approval* of the requested consolidation that this Court would be required to review the determination de novo, based on 12 U.S.C. § 1828(c)(7)(A). However, the FDIC takes the position that since the Act is silent on the method, standards and scope of review following a denial, as here, that the review is substantially more limited because it is governed by the Administrative Procedure Act, 5 U.S.C. § 706, which provides that a "reviewing court shall ... hold unlawful and set aside agency action, findings and conclusions" which it finds are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ...". 5 U.S.C. § 706(2)(A). In support of this contention the defendant relies upon *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413–416, 91 S.Ct. 814, 822–824, 28 L.Ed.2d 136, 151–153 (1971); *Camp v. Pitts*, 411 U.S. 138, 140–142, 93 S.Ct. 1241, 1243, 36 L.Ed.2d 106 (1973); *Washington Mutual Savings Bank v. Federal Deposit Ins. Corp.*, 347 F.Supp. 790, 792–793 (W.D. Wash., 1972), *aff'd* 482 F.2d 459, 464 (9th Cir. 1973). On the other hand, plaintiffs argue that because the sole issue before this Court is an antitrust question, which is peculiarly within the province of federal courts to determine, under the rule announced in *United States v. First City National Bank of Houston*, 386 U.S. 361, 366–369, 87 S.Ct. 1088, 1092–1094, 18 L.Ed.2d 151 (1967) and *United States v. Crocker–Anglo National Bank*, 277 F.Supp. 133, 144–147 (N.D.Calif.1967), and the very language and intent of the Bank Merger Act itself requires a de novo review by this Court.

The Fifth Circuit has apparently not spoken to this question.

With all due respect, this Court disagrees with the conclusion of the United States Court of Appeals for the Ninth Circuit and the United States District Court which it affirmed in *Washington Mutual Savings Bank, supra,* that the scope of review is substantially more limited in a case in which there is an appeal from the denial of a bank merger than if the appeal was from an approval thereof by the administrative agency, inasmuch as we are of the opinion that the legislative history of the Bank Merger Act and the language of the Act itself requires a contrary finding. Reliance by those courts on the Supreme Court opinions in *Overton Park* and *Camp* is misplaced, and *First City National Bank, supra,* and *Crocker–Anglo, supra,* the former being the only Supreme Court opinion speaking to the question of the scope of review on appeal to United States District Court of a bank merger determination by the administrative agency, are the better authority and support the plaintiffs' de novo argument.

*Overton Park* did not involve an administrative action relating to banking, much less the question of anticompetitive effect of a proposed merger, but was an appeal by private citizens from the Secretary of Transportation's determination to authorize use of federal funds to finance construction of highways through a public park without a required finding that there were no feasible alternative routes for the proposed interstate highway. Although *Camp v. Pitts, supra,* did constitute an appeal from a decision by the Comptroller of Currency denying a national bank charter, his finding was one based on his expertise on banking needs, having found that "a new bank was an uneconomic venture in light of the banking needs and the banking services already available in the surrounding community." 411 U.S. at 143, 93 S.Ct. at 1244.

As noted by the District Court in *Washington Mutual Savings, supra,* although the Bank Merger Act dictates de novo court review of the responsible administrative

agency's determination to approve a merger, 12 U.S.C. § 1828(c)(7)(A), the Act is silent on the method, standards and scope of review where the agency denies the requested merger. 347 F.Supp. at 792. This Court is mindful of the fact that both *First City National Bank* and *Crocker–Anglo* involved appeals to the courts by the Government from the administrative agency's approval of the requested bank mergers, seeking to enjoin the mergers under Section 7 of the Clayton Act and Section 1828(c)(5)(B) of the Bank Merger Act of 1966, on the ground that the proposed merger would substantially lessen competition by virtue of their anticompetitive effect. The question therefore before the Court is whether a different standard is to be applied or should be applied by the courts in determining that very same question decided differently by the administrative agency.

Nothing in the language of the Act or its legislative history persuades this Court that a different standard should apply or that the scope of review should be different depending upon who loses or wins before the administrative agency, where, as here, the antitrust issue is the only issue. The Supreme Court in *First City National Bank, supra,* specifically addressed the question of whether judicial review of the administrative agency' (Comptroller's) determination of no anticompetitive effect is in the category of other administrative rulings which must be upheld unless the reviewing court is persuaded that they are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The court stated that in an antitrust action brought to enjoin administrative approval of bank mergers that it had never previously stopped to consider what weight, if any, should be accorded the agency's antitrust determination, citing *United States v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915, *United States v. First National Bank,* 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1. The court went on in First City National Bank to state:

"Traditionally in antitrust action involving regulated industries, the courts

have never given presumptive weight to a prior agency decision, for the simple reason that Congress put such suits on a different axis than was familiar in administrative procedure. (citations omitted). We have found no indication that Congress designed judicial review differently under the 1966 Act than had earlier obtained.

In fact, as already noted, 'the standards applied by the court shall be identical with those that the banking agencies are directed to apply' 12 U.S.C. § 1828(c)(7)(B). This language does not express the conventional standard, i. e., whether the agency's action is supported by substantial evidence. In the latter instance, it is the agency's function to determine whether the law has been violated, while it is the court's function to ascertain whether, absent error in statutory construction, the agency's action has substantial support in the evidence.

There is no indication that Congress took that course here. Indeed the 1966 Act provides that the court in an antitrust action 'shall review de novo the issues presented.' . . . It is argued that the use of the word 'review' rather than 'trial' indicates a more limited scope to judicial action. The words 'review' and 'trial' might conceivably be used interchangeably. The critical words seem to us to be 'de novo' and 'issues presented.' They mean to us that the court should make an independent determination of the issues. Congressman Patman, the Chairman of the House Committee that drafted the Act, in speaking of this de novo review, said that the court would completely and on its own make a determination as to whether the challenged bank merger should be approved under the standards set forth in paragraph 5B of the bill. He added that the 'court is not to give any special weight to the determination of the bank supervisory agency on this issue.' 112 Cong.Rec. 2335 (Feb. 8, 1966) . . . .

    *      *      *      *      *      *

The courts may find the Comptroller's reasoning persuasive or well nigh conclusive. But it is the court's judgment, not the Comptroller's, that finally determines whether the merger is legal. That was the practice prior to the 1966 Act; and we cannot find a purpose on the part of Congress to change the rule. This conclusion does not raise serious constitutional questions by making the courts perform non judicial tasks. The 'one rule of reasoning' long prevalent in the antitrust field (see, e. g., *Chicago Board of Trade v. United States*, 246 U.S. 231 [38 S.Ct. 242, 62 L.Ed. 683]), has been administered by the courts. A determination of the effect on competition within the meaning of Section 7 of the Clayton Act is a familiar judicial task . . . . The appraisal of competitive factors is grist for the antitrust mill. See, e. g., *United States v. Philadelphia National Bank, supra* [374 U.S. at] 357–367 [83 S.Ct. at 1738.] The courts are not left at large as planning agencies. The effect on competition is the standard; and it is a familiar one. If the anticompetitive effect is adverse, then it is to be excused only if 'the convenience and need of the community be served' clearly outweigh it. We see no problems in bringing these standards into the area of judicial competence . . . .'

In *Crocker–Anglo, supra*, the three–judge district court stated:

We found no difficulty in reviewing de novo the first of these determinations [whether the effect of the proposed merger transaction in any section of the country may be substantially to lessen competition], for this court has traditionally adjudged whether mergers have anticompetitive effects . . . ."

This Court is of the opinion that under the facts and circumstances of this case in which the sole reason for denial of the consolidation application by the FDIC was an anticompetitive finding, which is the only issue before us as stipulated by the parties, this Court may review this issue de novo and make an independent determination thereof. However, if we are in error in so deciding, and the proper scope of review

in this case is limited to whether the FDIC's action in denying the merger was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law (5 U.S.C. § 706(2)(A)) or whether there is substantial evidence to support the agency's decision, the legislative history and Supreme Court interpretation of the 1966 Act indicate that all bank merger applications are to be subjected to traditional antitrust analysis. The "applicable standards of Section 706 require the reviewing court to engage in a substantial inquiry . . . . But that presumption [of regularity] [is not to shield the administrative] action from a thorough, probing, in–depth review." *Citizens to Preserve Overton Park, supra,* 401 U.S. at 415, 91 S.Ct. at 823. See also *Washington Mutual Savings Bank, supra,* at 793.

Therefore, regardless of what the proper scope of review is or what standard is to be applied, there is only one issue before this Court in this case, namely, what is the proper or correct relevant geographic market to be considered in determining the anticompetitive effect of the proposed merger. The parties agree, and this Court concurs, that the determination of this case boils down to that one precise question. We must make this determination and our conclusion is the same under either of the foregoing standards of review, applying the principles of law enunciated by the courts to the facts of this case.

### The Ultimate Question–The Anti–Competitive Effect of the Proposed Merger

█ The statutory test is whether the effect of the proposed merger "may be substantially to lessen competition" "in any line of commerce in any section of the country." "Line of commerce" is synonymous with relevant product or services market and "section of the country" is synonymous with the relevant geographic market in which to appraise the probable competitive effects of the plaintiffs' proposed merger. The parties agree that the well–established rule the relevant product market or line of commerce is the business of commercial banking, together with the cluster products

and services attendant thereto. See *U. S. v. Philadelphia National Bank, supra,* 374 U.S. at 356, 83 S.Ct. at 1737; *U. S. v. Marine Bancorporation, Inc.,* 418 U.S. 602, 618, 94 S.Ct. 2856, 2868, 41 L.Ed.2d 978 (1974). Furthermore, plaintiffs do not rely upon the exception embodied in the Bank Merger Act of 1966, § 1828(c)(5)(B), which provides that "in any . . . proposed merger transaction whose effect in any section of the country may be substantially to lessen competition . . . [shall not be approved by the responsible banking agency] unless it finds that the anticompetitive effects of the proposed merger are fully outweighed in the public interest by the probable effect of the transaction in meeting the convenience and the needs of the community to be served," and therefore this issue is not before this Court.

The controlling issue before this Court at this time is whether the effect of the proposed merger may be substantially to lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and of the Bank Merger Act of 1966 (12 U.S.C. § 1828(c)). The parties seemingly agree that this Court's determination of that ultimate issue is governed by the determination of whether the defendant FDIC correctly found the "section of the country" or relevant geographic market to be the entire area of Pike County, Mississippi, rather than the northern half of the County, which the plaintiffs contend is the appropriate section of the country or relevant geographic market for purposes of determining the anticompetitive effect of the proposed consolidation. We agree with the parties that the resolution of the relevant geographic market in determining the anticompetitive effect of the proposed merger is the determinative and crucial issue herein at this time.

In determining the appropriate "section of the country" or relevant geographic market, the test, or proper question to be asked, is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate–this depends

upon the geographic structure of supply—customer relations; more specifically, the area of effective competition in the known line of commerce must be chartered by careful selection of the market area in which the seller operates and to which the purchaser can practicably turn for supply. *U. S. v. Philadelphia National Bank, supra,* 374 U.S. at 357–359, 83 S.Ct. at 1738. When applying the foregoing test to bank merger cases, it is necessary to delineate the area in which bank customers that are neither very large nor very small find it practical to do their banking business. 374 U.S. at 361, 83 S.Ct. at 1740. Relevant geographic market has been further defined by the Court in *Marine Bancorporation* as "the area in which the goods or services at issue are marketed to a significant degree by the acquired firm . . . but in no previous Section 7 case has the Court determined the legality of a merger by measuring its effects on areas where the acquired firm is not a direct competitor . . . . We hold that in a . . . case like this one, the relevant geographic market or appropriate section of the country is the area in which the acquired firm is an actual, direct competitor." *U. S. v. Marine Bancorporation, supra,* 418 U.S. at 620–622, 94 S.Ct. at 2869. The test as to whether any given geographic area is a relevant (economically significant) market or section of the country is not based on political boundaries, but is based on economic grounds. *United States v. Crocker–Anglo National Bank, supra,* at 173.

■ In delineating the relevant geographic market, it is necessary to consider (1) the places from which a bank draws its business, (2) the location of its offices, and (3) the area in which a bank customer who is neither very large nor very small can, as a practical matter, turn to do his banking, *U. S. v. Philadelphia National Bank, supra,* 374 U.S. at 361, 83 S.Ct. at 1740; *see also U. S. v. Connecticut National Bank,* 418 U.S. 656, 666–670, 94 S.Ct. 2788, 2794, 41 L.Ed.2d 1016 (1974).

We now apply the foregoing standards for determining "section of the country" or "relevant geographic market" to the facts of this case in order to determine the issue before us. The FDIC apparently defends its determination that the entire area of Pike County is the relevant geographic market for testing the anticompetitive effect of the proposed merger on two grounds, only the first of which was articulated by the FDIC in its Order disapproving the proposed consolidation: (1) "due to the ease of access and the proximity of five of proponents' seven offices, the two banks are in direct, significant competition throughout Pike County and the approval of the proposed consolidation would eliminate this competition; and (2) that throughout the entire administrative record (with the exception of the study of Dr. Dennis based solely on demand deposits) and in their application for permission to merge, the plaintiff banks conceded that the entire area of Pike County constituted the service area of both banks, that is, both banks were operating in the same service area, the whole of Pike County, had some common customers and all deposits and loans originating in each other's service area; that the market area and service area of the Resulting Bank will continue to be Pike County; and that it was only after it appeared that the FDIC would deny their application for merger that the plaintiffs alleged that Pike County should be divided in half, with BM's service area north of a line drawn east to west through the county and SMB's service area south of that line, offering the Dennis evaluation in support thereof." Furthermore, the defendant contends that the Dennis evaluation, which admittedly is unrefuted, is unreliable inasmuch as it dealt with only demand deposits, which is the one banking service that people particularly want close to them, but did not deal with or include time and savings deposits, loans, or other kinds of commercial banking services.

The plaintiff banks answer by arguing that the "office proximity" rationale or criterion for determining the relevant geographic market herein is erroneous as a matter of law because it is more stringent, contrary to and at war with the proper test or standard enunciated by the Supreme Court, and therefore constitutes arbitrary

action for a determination "otherwise not in accordance with law" and must be reversed, even applying the "administrative appeal" rule contended for herein by FDIC. See *Washington Mut. Sav. Bank v. Federal Deposit Ins. Corp., supra.* The plaintiffs answer the defendant's contention that they have conceded or admitted in the administrative record herein and the plaintiff's application for merger that the entire area of Pike County is the relevant geographic market found by first stating that even if such a concession or admission was made in the application and/or in other places in the administrative record, that they were entitled to change their position based on the evidence presented by them in Dr. Dennis' study and evaluation report and that this case should be decided on the legalities of the situation as evidenced by the facts and the law. However, they deny that there was any such admission or concession by them in the first instance inasmuch as they only alleged that the two banks were competing in Pike County and that the proper test, as stated above, is "... not ... where they [merging banks] compete, but where within the area of competitive overlap the effect of the merger or competition will be direct and immediate," and that at no time have they ever alleged or admitted in their application or anywhere else in the administrative record that their proposed merger or consolidation would have direct and immediate anticompetitive effects in the area of their competitive overlap, but quite the contrary. They also argue that the study of Dr. Dennis, an acknowledged expert, which they contend is unrefuted and unchallenged, is reliable inasmuch as he concluded that demand deposits represent a reasonable and appropriate proxy for the geographic market because they constitute the central core upon which commercial banks are differentiated from other deposit institutions and make them unique among financial institutions in that they alone are permitted by law to accept such deposits.

Although the contents of the application of SMB to consolidate with BM, which was filed with the defendant FDIC, and the supportive instruments and information furnished the defendant by the plaintiff banks, as well as all parts of the administrative records, are relevant and should and are considered by this Court in making its determination of the relevant geographic market in which to measure the anticompetitive effect of the proposed consolidation, we find no merit in the contention of the defendant that SMB has conceded or admitted that the whole of Pike County is the relevant geographic market or "section of the country" herein. This is particularly so since we are dealing with a matter of public policy and have the responsibility of determining the true relevant geographic market by applying the established law to the actual facts of this case. The ultimate question of whether a consolidation or merger comes within the bans of Sec. 7 and the Act requires and is dependent upon the determination of the relevant market, because the threatened monopoly must be one which will substantially lessen competition "within the area of effective competition," and substantiality can be determined only in terms of the market affected. *Brown Shoe Co. v. United States,* 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962).

Under the standard announced in *United States v. Marine Bancorporation, supra,* 418 U.S. at 620–621, 94 S.Ct. at 2869 "section of the country" and "relevant geographic market" are identical, and are defined as the area in which the goods or services at issue are marketed to a significant degree by the *acquired firm* (emphasis supplied); see also *United States v. Connecticut National Bank, supra* 418 U.S. at 667, 94 S.Ct. at 2795. In determining relevancy of the geographic market it is necessary to look to its economic significance and this is based not on political boundaries, but on economic grounds. *United States v. Crocker Anglo–National Bank, supra* at 173. Therefore, a pragmatic approach is required in order to determine the actual relevant area, and in doing so the determinative factor is where the proposed acquired bank is in direct, substantial competition with other commercial banks, which of course depends upon a careful analysis of

the evidence of record which reflects where the vast bulk of its business originates, while at the same time not closing our eyes in making this same determination concerning the acquiring bank, in order to determine whether they are actual substantial competitors in the relevant geographic market area. Only in this way can the proposed consolidation's effect on competition be reliably and correctly appraised or measured.

Although the relevant geographic market may be so large as to encompass the entire nation, it may be as small as a single metropolitan area, *Brown Shoe, supra* 370 U.S. at 337, 82 S.Ct. at 1530, or even a zip code area. *United States v. Idaho First National Bank,* 315 F.Supp. 261. It must delineate in a way that takes into account the local nature for the demand of most bank services. *Connecticut National, supra* 418 U.S. at 668, 94 S.Ct. at 2795. As the Supreme Court stated in *Phillipsburg,*

"Commercial realities in the banking industry make clear that banks generally have a very localized business. We observed in *Philadelphia Bank, supra* [374 U.S.] at 358 [83 S.Ct. at 1738,] that 'in banking, as in most service industries, convenience of location is essential to effective competition. Individuals and corporations typically confer the bulk of their patronage on banks in their local community; they find it impractical to conduct their banking business at a distance .... The fact of inconvenience localizes banking competition as effectively as high transportation costs in other industries.' In locating 'the market area in which the seller operates,' it is important to consider the places from which it draws its business, the location of its offices, and where it seeks business. As indicated, the appellee banks' deposit and loan statistics show that in 1967 they drew 85% of their business from the Phillipsburg–Easton area, and, of that, only about 10% from Easton ...." *United States v. Phillipsburg National Bank & Trust Co.,* 399 U.S. 350, 362–363, 90 S.Ct. 2035, 2042, 26 L.Ed.2d 658.

Pike County, Mississippi, which had a population of 31,756 people in 1970, is located in the southwestern portion of the state adjoining the Mississippi–Louisiana boundary. Its economy is chiefly predicated upon agriculture, however, some industrial firms have located along Interstate 55 and U.S. Highway 51, in the McComb area. The town of Magnolia, where SMB is headquartered in South Pike County, is the county seat, with a population of 1,913. The City of McComb, where BM has its main office and two of its three branch offices, with a population of 11,969, serves as the county's chief commercial center. The economic picture of this area is static with moderate declines in both population and agricultural activity in evidence, and the effective median household buying level of $8,441.00, as of 1976, is significantly lower than the state and national average.

■ The FDIC's determination that the whole of Pike County constitutes the relevant geographic market by which to measure the anticompetitive effect of the proposed consolidation, which led to its conclusion that the plaintiff banks were in direct, substantial competition with each other throughout the entire county, seems to be premised on the fact that "due to the ease of access and the proximity of five of the proponents' seven offices, the two banks are in direct, significant competition, and refused to accord validity or reliability to the statistical analysis by the plaintiff's economic expert, Dr. Dennis, because it dealt only with the source of demand deposits of each of the plaintiff banks, without analyzing the source of its loan and time deposits. Specifically, the defendant took and maintains the position that demand deposits alone are not a reliable yardstick by which to measure the source of a commercial bank's business, inasmuch as local customers are more prone to have their checking accounts in a bank closer to their homes or businesses and to make their loans from, and time deposits in, banks farther away. We reject this theory, which is not only unsupported by any evidence in this case, but is contrary to the history of banking,

particularly in rural, sparsely inhabited counties composed of only a few small towns and inhabited by residents with low per capita income, as in the case sub judice. The Supreme Court recognized in *Phillipsburg* that "although the City of Phillipsburg was sufficiently small, rendering easy access to its downtown area where the banks in question had their main offices, nevertheless, the bank found it necessary to open branches in the suburbs because that is where the customers were located, and that "one town" banks generally compete for deposits within the radius of only a few miles; localization of business typical of the banking industry is particularly pronounced when small customers are involved; in banking, the relevant geographical market is a function of each separate customer's economic scale, i. e., the smaller the customer, the smaller is his banking market geographically; that small depositors have little reason to deal with a bank other than the one most geographically convenient to them; that geographic convenience can be a more powerful influence than the availability of a high rate of interest at a more distant, though still nearby, bank; that the small borrower, if he is to have his needs met, must often depend upon his community reputation and upon his relationship with the local banker; and that small businessmen specially, or as a practical matter, are confined to their locality for the satisfaction of their credit needs, and that small borrowers frequently cannot practically turn for supplies outside their immediate community, and the small depositor,–because of habit, custom, personal relationships, and above all convenience,–is usually unwilling to do so." 399 U.S. at 362–365, 90 S.Ct. at 2042.

In reviewing the record of this case, we find that the statistical study of Dr. Dennis is the only in depth study and evidence of the source of the bulk of the business of each of the plaintiff banks. Before discussing the substance of Dr. Dennis' study, which is unrefuted and persuasive, we must address the unreliability argument of the

defendant based on the fact that it reflects only the source of demand deposits and does not include a study of the other usual services offered by a commercial bank, including loans and time deposits. We disagree with this contention. Although it certainly would have been preferable to have had a more complete or comprehensive analysis of the source of all the business of the plaintiff banks, we are nevertheless of the opinion that in the absence of any evidence to the contrary, Dr. Dennis' study and analysis based upon demand deposits is not invalid or unpersuasive. As has been recognized by the Supreme Court, "commercial banks are unique among financial institutions in that they alone are permitted by law to accept demand deposits, which distinctive power gives them a key role in the national economy by augmenting the nation's credit supply when it makes a loan by crediting the borrower's demand deposit account." The Court went on to recognize that "the power to accept demand deposits makes banks the intermediaries in most financial transactions and, concomitantly, the repositories of various substantial individual and corporate funds; and that the bank's use of these funds is conditioned by the fact that their working capital consists very largely of demand deposits, which makes liquidity the guiding principle of banking and investing policies, which in turn makes them the chief source of the country's short–term business credit." *U. S. v. Philadelphia National Bank, supra* 374 U.S. at 326, 83 S.Ct. at 1721. It has further been recognized that demand deposits, which only commercial banks may accept, are an appropriate product–service constituting a line of commerce in every bank merger case. *United States v. Idaho First National Bank, supra* at 267. Thus, demand deposit accounts, which constitute the central and distinguishing core of business upon which commercial banks are differentiated from other deposit institutions as a separate product market, are the reasonable and peculiarly appropriate proxy for geographic markets.[1]

---

1. The record in this case discloses no question or challenge by anyone of the validity of the

Dennis report because it was based solely upon an analysis of demand deposits and discloses

Having made this determination, we turn now to the only evidence of record concerning the source of the product service or line of commerce of the plaintiff banks in order to determine the market area in which each significantly competes.

Dr. Dennis was not the first to recognize and discuss the fact that SMB and BM did not substantially compete with each other, but that each principally operated in different market areas, with some minimal overlap. The defendants' Field Examiner, James M. Martin, Jr., recognized and discussed these factors in detail on pages 7–9 and 18 of his lengthy and detailed Report of Investigation to Roy E. Jackson, Regional Director of FDIC in Memphis, Tennessee, which is dated March 6, 1978 and is a part of the confidential records and internal communications of the FDIC transmitted under seal to this Court for its review in deciding this case. On page 7 of his report, Mr. Martin found only minimal direct competition between the two banks; that the effect on competition would not be adverse; and there would be no tendency toward a monopolistic situation if the consolidation consummated. He therefore recommended that the Application be approved and his recommendation was concurred in by the defendants' Regional Director. Specifically, Mr. Martin found that the market area of the applicant, SMB, was limited primarily to the lower portion of Pike County and surrounding area; that the relevant trade area of BM includes northern Pike County and the surrounding areas; and that the service or market area of the two banks are very similar, overlapping in Pike County, but that that competition is not considered great because the applicant SMB does not aggressively solicit business from the McComb area and BM does not try to compete within Magnolia, but the most intense competition provided by either of the banks comes from the branches of the two large banks which operate through several branches in McComb with their main offices in Jackson, Mississippi.

no request or suggestion by the defendant for information concerning other business of the two plaintiff banks or any attempt on the part of FDIC to gain such information. In making

Dr. Dennis' uncontradicted report reveals that BM, the bank to be acquired, has 94.55% of its demand deposit accounts in the northern half of Pike County and 3.07% in the southern half, and that the applicant or acquiring bank, SMB, has 90.93% of its demand deposits in the southern half of Pike County and 5.93% in the northern half. He concluded that "the modest overlap" was not sufficient to place the two banks in substantial effective competition in the Northern half of Pike County, the geographic market in which the proposed acquired bank, BM, substantially competes with DGNB and FNB, who have branched into McComb; and thus, the relevant geographical market or critical area in which to measure the anticompetitive effect of the proposed consolidation is the Northern half of Pike. Likewise, he concluded that there is no substantial effective competition between the two plaintiff banks in the southern half of Pike County, wherein only the SMB operates, each of the towns located therein, including Magnolia, being below the minimum population which is a prerequisite to branching therein by other banks.

The Supreme Court rejected a countywide geographic market when no more than 4.1% overlap was demonstrated, and likewise, a countywide market was rejected in *United States v. First National Bancorporation, Inc.,* 329 F.Supp. 1003 (D.C.Colo.1971), *affd.* 410 U.S. 577, 93 S.Ct. 1434, 35 L.Ed.2d 507 (1973), and in *United States v. Idaho First National Bank, supra,* where overlaps of 6.6% and 5.5%, respectively, were found insufficient to constitute actual, substantial competition.

The Supreme Court in *United States v. Connecticut National Bank,* noted that the Federal Bank Regulatory Agencies define a bank's service area as the geographic area from which the bank derives 75% of its deposits. 418 U.S. at 670–671, fn. 9, 94 S.Ct. at 2797, fn. 9.

this determination, we have relied solely upon the record and have not considered any of the affidavits offered or filed herein by either side.

Here, as in *Crocker–Anglo, supra* at 177, we feel that customers in one community have no need to, and ordinarily do not, go to another community to do their banking, and in many localities the number of banking offices are such that customers will not consider doing their banking at an office more than a few city blocks distant. Also, there is no evidence of record that any branch of SMB is located so as to constitute competition with a branch of BM, and there was no city, town or suburb thereof in which both banks had either their main office or branch offices. Even if that were not true and it was assumed that there was competition between the nearest offices of either of the banks, such competition was certainly insignificant as distinguished from substantial. The mere fact that both banks had a small number (15%) of common customers likewise does not indicate that they were competing for the business of that customer. *See United States v. Crocker–Anglo, supra* at 177.

Inasmuch as individuals and corporations generally prefer to do their banking in their local communities, banks normally have very localized businesses and the fact of inconvenience primarily localizes banking competition. This is particularly so and more especially pronounced where, as here, two relatively small country banks are involved. *See United States v. Philadelphia National Bank, supra* 374 U.S. at 358, 83 S.Ct. at 1738; *United States v. Phillipsburg National Bank & Trust Co., supra* 399 U.S. at 363–364, 90 S.Ct. at 2043; *United States v. Connecticut National Bank, supra* 418 U.S. at 667–668, 94 S.Ct. at 2795; *United States v. First National Bancorporation, Inc., supra* at 1013.

In view of the above undisputed facts and the established law, whether this Court is correct in finding that it is authorized to review this matter de novo, or whether its review is limited to the traditional APA review criteria, we are of the opinion and find that the FDIC's finding and conclusion that the entire area of Pike County, Mississippi is the relevant geographic market by which to appraise the anticompetitive effects of the proposed consolidation is erroneous as a matter of law, and that its basis for reaching that conclusion is arbitrary or otherwise not in accordance with the law. *Cf. Washington Mut. Sav. Bank v. Federal Deposit Ins. Corp., supra.*

It is this Court's considered opinion and conclusion that SMB and BM are not in actual, effective or substantial competition in the northern portion of Pike County, the service market area of the Bank of McComb, which is proposed to be acquired by SMB, and which is the relevant geographic market in which to measure the proposed consolidation's effect on competition.

### Effect on Potential Competition–De Novo Branching

In its original Opinion dated May 19, 1978, which formed the basis for its Order denying the application to consolidate, the FDIC found that the proposed consolidation of the two banks would: "(1) eliminate substantial existing competition, (2) increase significantly the level of deposit concentration in the local market, (3) reduce the number of alternative sources of commercial banking services in the market, eliminating one of the two locally based banks, and (4) eliminate the potential for increased future competition between the proponents." In view of this Court's above finding and the appropriate remedy dictated thereby, it is not necessary to further discuss the above findings, Nos. 1, 2, or 3, inasmuch as these are matters which must be reconsidered by the FDIC on remand of this case, we still feel it necessary to discuss finding No. (4), that is, the elimination of potential for increased future competition between the plaintiffs.

A merger or consolidation substantially lessens competition if it joins two companies having a combined significant share of the defined product market in a defined geographic area even though the applicant and proposed acquired institution are not in the same geographic or product market, though the consolidation may nevertheless be designated anticompetitive if it brings

into being conditions which themselves constitute a substantial lessening of competition in the geographic market or appropriate section of the country in which the *acquired* firm is an actual, direct competitor. (emphasis supplied). *United States v. Marine Bancorporation, supra* 418 U.S. at 622 *et seq.*, 94 S.Ct. at 2870 et seq. The potential competition doctrine has generally arisen in banking in the context of a geographic market extension affiliation, that is, where a banking organization enters a market it had not previously significantly served, by the acquisition of one of the banks serving that particular market. The principal focus of the doctrine is on the likely effects of the premerger position of the acquiring firm on the fringe of the target market. In developing and applying this doctrine, since the number of competitors would not change, a substantial adverse competitive effect could be postulated through the loss of influence by the entering organization upon the competitive conduct of extant competitors, that is perceived potential entrants, *U. S. v. Falstaff Brewing Corp.*, 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973), or through the loss of that organization as a likely entrant into a highly concentrated market ("actual potential entrants"). Stated another way, the principal focus of the doctrine is on the likely effects of the premerger position of the acquiring firm on the fringe of the target market. It has been recognized that a market extension merger may be unlawful if the target market is substantially concentrated, if the acquiring firm has the characteristics, capabilities and economic incentive to render it a perceived potential de novo entrant, and if the acquiring firm's premerger presence on the fringe of the target market in fact tempered oligopolistic behavior on the part of existing participants in that market. Stated another way, the Supreme Court has interpreted as the "wings effect", that is, the probability that the acquiring firm's prompt premerger procompetitive effects within the target market by being perceived by the existing firms in that market is likely to enter de novo. The elimination of such present procompeti-

tive effects may render a merger unlawful under § 7. *United States v. Marine Bancorporation, supra* 418 U.S. at 624–625, 94 S.Ct. at 2871.

If a market is already competitive, there can be no violation of the Clayton Act through invocation of a potential competition theory, but if the market is highly concentrated, there is a rebuttable presumption that the market is not competitive and the burden shifts to the proponents to establish, in those segments of bank competition not regulated, that the banks serving the market do compete in a responsible manner. *U. S. v. Marine Bancorporation, supra.*

It is difficult to visualize how the FDIC determined that Section 7 of the Clayton Act would be violated by the proposed consolidation through potential entrance of SMB into the market of BM, when in fact it found and concluded and based its action upon the fact that the two banks were already in actual substantial competition in the whole of Pike County. This Court does not feel it necessary to discuss this question at great length in view of the fact that it is a matter which must be addressed by the FDIC on remand of this case, when it measures the anticompetitive effect of the proposed consolidation in the proper and relevant geographic market being served by the proposed acquired bank, BM.

It should be noted that the Supreme Court, in *Marine Bancorporation* has given the caveat that in applying the doctrine of potential competition to commercial banking, the extensive federal and state regulations of banks must be taken into account, particularly as they apply to de novo entry and to expansion following entry into a new geographic market. *U. S. v. Marine Bancorporation, supra* at 627 and 641, 94 S.Ct. at 2872 and 2879.

In determining whether an alleged future effect on competition by itself justifies blocking a present corporate acquisition under the actual potential entrant doctrine, two distinct questions must be answered: first, would the firm in question

**16**

enter de novo or by toehold acquisition if not permitted to enter by acquiring a large company; and, second, would the de novo or toehold entry of the firm have a procompetitive effect on the market in question. The test or standard to be used in making this determination is whether there is of record substantial evidence which shows a reasonable probability of near entry de novo but for the consolidation or merger. *BOC International Ltd. v. FTC*, 557 F.2d 24, 26–29 (2d Cir. 1977). This Court has carefully reviewed the administrative record below and is unable to find any substantial evidence to support any conclusion that SMB would have entered BM's geographic market area or service area by branching into the town of McComb or any outlying area in the northern portion of Pike County, BM's market area, which is belied by the fact that it has never attempted to do so. *Cf. U. S. v. First National Bancorporation, Inc., supra* at 1014 et seq.; *U. S. v. Idaho First National Bank, Inc., supra* at 270–272; *U. S. v. Crocker–Anglo, supra* at 184 et seq. Another consideration also is that there are 64 other banks in Mississippi, several of whom are larger than SMB, and the location of whose main offices within 100 miles of BM's service area legally permit them to branch into McComb and the northern portion of Pike County and other service areas of BM. It should also be noted that two large Jackson banks have now branched into McComb and have several branch offices located in that immediate area.

*Remedy*

In view of this Court's decision in this case that the FDIC's determination of the relevant geographic market in which to measure the anticompetitive effect of the proposed consolidation was erroneous as a matter of law and that the basis therefor was arbitrary and otherwise not in accordance with law, the question remaining at this time is the proper remedy. The guiding principle, as stated by the Supreme Court, is that the function of the reviewing court ends when an error of law is laid bare. At that time the matter once more goes to the agency for reconsideration. *See U. S. v.*

*First City National Bank of Houston, supra* 386 U.S. at 370, 87 S.Ct. at 1094; *FPC v. Idaho Power Co.*, 344 U.S. 17, 20, 73 S.Ct. 85, 87, 97 L.Ed. 15, 20 (1952). Although this Court may be of the opinion that only one decision is proper on the basis of the record relevant to a determination in this case, it is not the duty or province of a reviewing court to make the final judgment once the law is determined, but it must remand the matter to the responsible agency for determination in light of the Court's construction of the governing legal principles. *Washington Mutual Savings Bank v. FDIC, supra* at 800.

Accordingly, a Judgment setting aside the order of the Federal Deposit Insurance Corporation denying the plaintiff, SMB's, application for consolidation and remanding this cause for reconsideration in accordance with this Court's opinion, shall be presented to the Court, approved as to form by counsel for both sides, in the manner and within the time prescribed by the local Rules of this Court.